# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DON SALAZAR** and **ANDREA SALAZAR,**
individuals, d/b/a **C&S TRUCKING CO.,**

      Plaintiff,

v.                                                                      **No: 1:18-cv-00765-RB-LF**

**THE QUIKRETE COMPANIES, LLC,**
A Delaware limited liability company,

      Defendants.

## MEMORANDUM OPINION AND ORDER

After several years of hauling mined material for Defendant Quikrete Companies, LLC (Quikrete), Plaintiffs Don and Andrea Salazar, d/b/a C&S Trucking Co. (C&S), sued to recover damages when Quikrete hired a lower-cost competitor to perform the work in 2018. Despite having no formal agreement, C&S alleges that it purchased additional equipment based on Quikrete's representations that C&S would have rights to the hauling job. Nevertheless, Quikrete found an alternative mover, and C&S lost this business. C&S now seeks reliance damages based on its dealings with Quikrete. In this Memorandum Opinion and Order, the Court takes up Quikrete's Motion for Summary Judgment contesting C&S's claims. (Doc. 35.) Given the illusory promises and C&S's unreasonable reliance, the Court will grant Quikrete's Motion for Summary Judgment.

## I.      Background

In 2013, C&S started hauling mined material for Quikrete. (Doc. 1 (Compl.) ¶ 6.) It moved several thousand tons from the mine in Monarch Pass, Colorado to Wellsville, Colorado each year. (*Id.* ¶ 1.) According to tax filings, Quikrete paid C&S an average of $239,817.90 per year through

2017. (*Id.* ¶¶ 1, 7.) Revenue earned throughout this period ranged from $86,084 at the low end to a maximum of $393,492. (*Id.* ¶ 7.)

As he performed more hauls for Quikrete, Mr. Salazar left his employment with Roserock Oil. (*Id.* ¶ 8.) Believing that C&S would continue to haul mined material for Quikrete indefinitely, C&S purchased approximately $418,000 worth of equipment in 2014,[1] including: a $150,000 2014 Peterbilt truck; a $44,000 Rancho Trailer; a $60,000 Travis Trailer; and a $165,000 544 front end loader. (*Id.*) C&S used this equipment for the next few years not only for Quikrete, but also for other mining companies. (Doc. 35-1 at 145:18–148:13.)

During the 2016 and 2017 hauls, however, Super Ex began competing with Plaintiff for the work. (*Id.* at 52:18–53:18.) C&S alleges that it "hauled mined material to Dallas at Quikrete's request at a reduced haul rate under duress which caused C&S to lose $80,917.59, . . . benefit[ing] Quikrete." (Doc. 1 ¶ 9.) Despite its expectation that C&S would continue to haul for Quikrete, "[o]n or about May 8, 2018, C&S . . . was notified by a representative of Quikrete (Eric Leigh) that Quickrete no longer needed [the] mined material hauling services of C&S." (*Id.* ¶ 11.) C&S has not hauled for Quikrete since December 13, 2017. (*Id.* ¶ 12.)

Plaintiff initiated this lawsuit on August 9, 2018, after Quikrete refused to compensate C&S for its alleged losses. (*Id.* ¶ 17.) Plaintiff claims that "Quikrete knew of C&S's expectation of continued hauling and also knew that C&S had purchased the equipment . . . in reliance on C&S's expectation that it would continue to haul mined material for Quikrete." (*Id.* ¶ 14.) On this basis, C&S now seeks $739,735.40 for (i) the 2018 hauling revenue, (ii) the equipment purchases,

---

[1] The precise date of purchase is unclear in the Complaint, but based on the deposition, the Court places the purchase sometime in 2014 prior to that year's haul. (Doc. 35-1 at 103:2–5.)

and (iii) the reduced haul rates across 2016–17. (*Id.* ¶ 18.) Defendant filed its Motion for Summary

Judgment on April 24, 2019, asking the Court to dismiss the claim against it. (Doc. 35.)

## II.      Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (reiterating the standard).

A "genuine" issue arises when "a rational trier of fact could resolve the issue either way." *Adler v.

Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citation omitted). And a material fact

"is essential to the proper disposition of the claim." *Id.* (citation omitted). To support the motion,

the moving party may employ "depositions, documents, electronically stored information,

affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials."

Fed. R. Civ. P. 56(c)(1)(A).

In assessing motions for summary judgment, the Court takes all reasonable inferences in

favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). The moving party bears the initial responsibility of "show[ing] that there is an

absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*,

939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once

the moving party passes this initial hurdle, "the burden shifts to the nonmoving party to set forth

specific facts showing that there is a genuine triable issue." *Johnson v. City of Roswell*, 752 F. App'x

646, 649 (10th Cir. 2018) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767

(10th Cir. 2013). The purpose of summary judgment is to "determin[e] whether there is the need

for a trial—whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

**III.    Analysis**

In a diversity action, the Court applies New Mexico choice of law rules. *See Elec. Distrib., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1083 (10th Cir. 1999). New Mexico utilizes a *lex loci* approach to contracts, which looks to the contracting location—or rather, where the accepting party agrees to contract. *See State Farm Mut. Ins. Co. v. Conyers*, 784 P.2d 986, 991 (N.M. 1989). Here, the alleged contract arose from communications between offeror Quikrete in Colorado and offerees Salazars at their home in New Mexico. (Doc. 35 at 13.) As a result, the Court will apply New Mexico law.

Plaintiff proceeds with a promissory estoppel theory. In *Strata Prod. Co. v. Mercury Expl. Co.*, the Supreme Court of New Mexico provided the promissory estoppel standard. 916 P.2d 822, 828 (N.M. 1996). To make out a prima facie case, a party must show:

> (1) An *actual promise* must have been made which in fact induced the promisee's action or forbearance; (2) The *promisee's reliance* on the promise must have been *reasonable*; (3) The promisee's action or forbearance must have amounted to a *substantial change in position*; (4) The promisee's action or forbearance must have been *actually foreseen or reasonably foreseeable* to the promisor when making the promise; *and* (5) enforcement of the promise is required to *prevent injustice*.

*Id.* (emphasis added) (citations omitted). As a theory of contract formation, promissory estoppel treats reliance as an alternative form of consideration when all other contractual elements are present. *See id.* Plaintiff fails to produce evidence sufficient to create disputes of fact for all five elements, so the Court will grant Defendant's motion and dismiss this lawsuit.

**A.  Quikrete did not promise C&S the 2018 haul.**

Defendant contends that Quikrete did not promise C&S the 2018 hauling contract, and therefore, Plaintiff cannot establish the first element of its promissory estoppel claim. (Doc. 35 at

4 (discussing Doc. 35-1 at 97:23–98:12; 118:10–119:10).) Though promissory estoppel replaces consideration in the contractual framework, it still requires an actual promise. That is, any subsequent reliance would be "unreasonable" if based on a promise that is "equivocal and ambiguous." *See Magnolia Mountain Ltd., P'ship v. Ski Rio Partners, Ltd.*, 131 P.3d 675, 683 (N.M. Ct. App. 2006). While interpreting New Mexico law, the Court has held that no promissory estoppel exists if "[a] reasonable juror could not find that an actual promise had been made . . . ." *Mendoza v. Honeywell Tech. Sols., Inc.*, No. 07-CV-124 WJ/RHS, 2008 WL 11322912, at \*12 (D.N.M. Apr. 23, 2008). Thus, "vague" statements cannot foreseeably induce reliance. *Id.*

Plaintiff cites several lines from Mr. Salazar's deposition to demonstrate that Defendant promised hauling services to C&S. For instance, Quikrete employee Mr. Leigh told C&S that it had the haul from Monarch Pass to Wellsville "until [it] wanted it." (Doc. 35-1 at 99:12–100:8.) And on another occasion, when asked about the upcoming haul, Mr. Leigh told Mr. Salazar: "Get ready for next year. I need 35,000 tons down the mountain." (*Id.* at 65:18–19.) Both statements imply that Quikrete intended to continue its relationship with C&S. Mr. Salazar further stated that: "[Mr. Leigh] assured me verbally that I would have it as long as I wanted the haul, because—the reason he assured me is because nobody wanted to go do the haul. They wanted to charge them, like, outrageous prices." (*Id.* at 104:16–20.) And when asked how long Mr. Salazar assumed the relationship with Quikrete would last, he claimed that he expected to have the haul for ten years. (*Id.* at 113:13–19.)

These promises, however, are vague and indefinite. Promises are illusory when they fail to establish price, quantity, or other material terms. *Salazar v. Citadel Commc'ns Corp.*, 90 P.3d 466, 469 (N.M. 2004). Contractual promises need to provide some level of detail to bind, or at least guide, the parties. Thus, statements like "*see you next year*" and "*for as long as* [*you*] *want it*" lack

the certainty needed to form legally binding duties. Here, Plaintiff does not provide examples of concrete promises or representations to demonstrate how Quikrete guaranteed the haul in 2018. At no point throughout the roughly five-year business relationship was their arrangement ever reduced to writing. Mr. Salazar believes that the haul from Monarch Pass to Wellsville was an undesirable job, for which Quikrete struggled to find willing drivers. (Doc. 35-1 at 104:16–105:12.) And Quikrete may have intended for Mr. Salazar to continue making this trip on a yearly basis, but this possible intent does not qualify as a promise without more concrete terms. While courts have the power to insert reasonable terms into a deficient contract, they do not have the power to write one from scratch.

Plaintiff also argues that the ongoing history between the parties coupled with Mr. Leigh's representations establishes an implied promise that C&S would continue to perform the haul. (Doc. 36 at 11.) But despite any representations Quikrete made to Mr. Salazar, Quikrete always negotiated new terms in the Spring for the upcoming season. Each May, Quikrete "discuss[ed] what the price for . . . hauling would be and then what the estimated tonnage was going to be." (Doc. 35-1 at 97:23–98:1.) During 2013–17, the agreed price per ton ranged from $10.50 to $12.50 each year. (*Id.* at 104:23–25). In 2016, Plaintiff hauled the material from a different location to Wellsville. (*Id.* at 49:3–52:25). Further, the lowest yearly payout was $86,084, while the maximum was $393,492. (Doc. 1 ¶ 7.) The different rates, routes, and totals suggest that the work performed each year varied significantly. While history may influence the level of detail needed to contractually bind parties in certain transactions, the working relationship between C&S and Quikrete was predicated on the specific agreement negotiated each spring.

The indefinite nature of Quikrete's and Mr. Leigh's statements are not enough to create a legal promise. As spring negotiations reset the terms of the relationship each year, the history

between the parties does not support the existence of any legal duty. Consequently, Plaintiff has failed to establish a genuine dispute of fact regarding the first element of promissory estoppel.

**B. C&S did not reasonably rely on the alleged promise regarding the 2018 haul.**

Defendant next argues that C&S was not reasonable in relying on Mr. Leigh's representations, thus failing to demonstrate the second element of promissory estoppel. (Doc. 35 at 7–8 (discussing Doc. 35-1 at 52:18–53:18; 85:8–13).) The New Mexico Supreme Court partially derived its promissory estoppel analysis from the seminal *Drennan v. Star Paving Co.* case, requiring "[r]easonable reliance resulting in a foreseeable prejudicial change in position." *Strata*, 916 P.2d at 828 (quoting 333 P.2d 757, 760 (Cal. 1958) (internal quotation marks omitted)). That is, a detrimental change in position must be "justifiable." *Chavez v. Manville Prods. Corp.*, 777 P.2d 371, 374 (N.M. 1989). This fact-based inquiry requires the Court to assess the alleged promise and whether the parties reasonably reacted to it. *See Magnolia Mountain Ltd.*, 131 P.3d at 683.

First, despite the mistaken belief that the work would always exist, Plaintiff admits throughout the deposition that competition for the haul existed—and in fact grew with time. Mr. Salazar states that he worried a competitor could undercut him on price. (*Id.* at 105:7–106:18.) He explained that the "ex-son-in-law" of Bill Tezak of Super Ex performed the haul for a cheaper price. (*Id.*) And once he heard that the competing price was only $3 per ton,[2] Mr. Salazar realized he would not be able to haul at that rate. (*Id.*) Next, he claims that Quikrete had "thousands" of trucks and "could have sent [its] trucks up to the mine and hauled the rock, themselves," but it lacked in-house drivers to carry the material from Monarch Pass to Wellsville. (*Id.* at 114:5–15.) Mr. Salazar even asked Mr. Leigh why Quikrete was unwilling to perform this haul on its own,

---

[2] The parties disagree about whether this $3 per ton amount was an actual outstanding contract for the haul or was a negotiation gambit to force C&S to lower its price. (Doc. 36 at 14.) Regardless, C&S declined to match the price and halted further negotiations. The rationale behind the price does not affect the Court's analysis.

recognizing a potential threat the company posed to Quikrete's arrangement with Plaintiff. (*Id.*) And finally, in 2016 C&S hauled Quikrete material to a different location because Super Ex performed the haul along C&S's traditional route—obviously altering negotiations and expectations going forward. (*Id.* at 53:2–18.) When discussing this action, Mr. Salazar even admitted that Super Ex had become a competitor. (*Id.*)

Next, the tasks C&S performed for Quikrete changed over time, so it was unreasonable for C&S to expect to haul material from Monarch Pass indefinitely. Given the changing nature of the work, C&S could not reasonably rely on the price, the amount it was transporting, or even the route Quikrete required it to travel. No set terms existed. Had there been a consistently established price or tonnage, Plaintiff would have a stronger reliance argument because Mr. Leigh's representations would trigger or reference the preexisting deal structure. But given that Plaintiff renegotiated each spring, there was no ongoing contract, only disparate agreements independently crafted each year.

Finally, Plaintiff contends that based on Mr. Leigh's representations and its purchase of $418,000 worth of equipment, it expected to haul Quikrete material in 2018. In his deposition, when asked why he purchased the equipment, Mr. Salazar responded that the haul required larger vehicles and that Mr. Leigh acknowledged the purchase. (Doc. 35-1 at 99:12–100:12.) Yet Plaintiff neither asked whether it was a good idea to purchase the equipment, nor told Mr. Leigh directly that it expected Quikrete to pay if it found an alternative hauler. (*Id.*) Though the exact purchase date of the equipment is unclear from the Complaint and deposition, Mr. Salazar states that he bought the equipment after Mr. Leigh told him to "Get ready for 2014." (*Id.* at 66:5–24.) And later, Mr. Salazar suggested that he had made payments on the equipment for "36 months." (*Id.* at 103:2–5.) C&S therefore used this equipment for at least three years. C&S not only partially recouped its

investment, but also leveraged the equipment to perform hauling services for other companies. This equipment was not purchased immediately before the 2018 haul or in direct reliance on promises that C&S would have the 2018 haul. Rather, C&S bought this equipment over three years before the 2018 negotiations broke down. In those interim years, C&S performed a variety of tasks with this equipment for Quikrete and other companies unrelated to the Monarch Pass route now at issue before the Court. Therefore, recognizing the arrival of competitive forces, the inconsistent work performed, and the timing of the equipment purchases, the Court must conclude that C&S's expectation to manage the 2018 haul was unreasonable.

### C. C&S unreasonably purchased equipment in reliance on Quikrete's representations.

Similarly, Defendant argues that C&S fails to satisfy the fourth element of promissory estoppel regarding the equipment purchase. (Doc. 35 at 9–11.) Based on Mr. Leigh's representations, it was unreasonable for C&S to purchase a $150,000 Peterbilt truck, a $44,000 Rancho trailer, a $60,000 Travis trailer, and a $165,000 544 front end loader ($418,000 total). (*Id.*) Hauling 35,000 tons of rock requires specialized equipment that an ordinary trucking company might not own. Plaintiff argues that Quikrete understood that C&S was a small business and needed to purchase equipment to make the haul more practicable. (Doc. 36 at 19–20.) When asked about Mr. Leigh's representations leading to these purchases, Mr. Salazar stated that, "[we] had a good relationship, and I trusted him. He told me he needed 35,000 tons that summer, and I believed him, and I went and got the truck, got the trailers, got the job done." (Doc. 35-1 at 66:20–24.) While Plaintiff did not explicitly share information about these purchases with Quikrete, Mr.

Salazar contends that Mr. Leigh "knew" about it. (*Id.* at 99:14.) Mr. Salazar further states that Mr. Leigh was pleased with the purchased equipment. (*Id.* at 99:19–25.)

The question, however, is not whether Quikrete knew about the purchases but whether it was reasonable for C&S to purchase over $400,000 worth of equipment based on Mr. Leigh's imprecise and vague statements. The Court finds that it was not. C&S purchased the equipment and proceeded to haul material for Quikrete. But Mr. Leigh never implied or hinted at the need for new equipment. Understanding or even appreciating C&S's purchases is not the same as inducing C&S to buy the trucks, trailers, and loader. Here, the equipment amounted to about twice the rate of the yearly revenue collected from Quikrete for the haul. At no point did C&S ask Quikrete if it should purchase additional equipment or attempt to solidify a long-term contract. (*Id.* at 104:3– 22.) Only two years after the purchase of the equipment, once payments piled up, did Mr. Salazar ask for anything in writing. (*Id.* at 104:9–22) While it may have been necessary to purchase this equipment to assist with the hauls for Quikrete, it was not reasonable for C&S to purchase this equipment for that sole purpose without a long-term contract in place.

## IV.     Conclusion

C&S failed to show that Mr. Leigh's representations about the ongoing nature of Plaintiff's work constituted a legally-binding promise that induced its purchase of hauling equipment. Mr. Leigh's discussions with C&S were of a vague and passing nature. His comments about *speaking next summer* or *having the haul* should not have inspired much confidence in the context of a business relationship—certainly not $418,000 worth of confidence. While it is unfortunate that the Salazars purchased the equipment and intended to continue working for Quikrete, only to lose the contract to a competing party, the Court must grant Quikrete's motion for summary judgment

because Plaintiff has failed to provide evidence sufficient to create genuine disputes of fact with respect to the first, second, and fourth elements of promissory estoppel.[3]

        **THEREFORE**,

        **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 35) is **GRANTED**;

        **IT IS FURTHER ORDERED** that this case is **DISMISSED**.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**

---

[3] In the end, the Court need not address undisputed facts two and four because C&S failed to establish a prima facie case for promissory estoppel. Fact 2 stated: "The Salazars declined to provide hauling services to Quikreete in 2018 by rejecting the price Quikrete was willing to pay." (Doc. 35 at 6.) Fact 4 stated: The Salazars provided hauling services or had the opportunity to provide hauling services to other customers in 2018." (Doc. 35 at 8.)